# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION



| | | |
|---|---|---|
| LAMACAR INC. d/b/a KELLI'S GIFT SHOP SUPPLIERS, | § § § | |
| Plaintiff | § § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-1396-S |
| THE CINCINNATI CASUALTY COMPANY, | § § § | |
| Defendant | § § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Lamacar Inc. d/b/a Kelli's Gift Shop Suppliers ("Lamacar") hereby files this First Amended Complaint against Defendant The Cincinnati Casualty Company ("Cincinnati") and would respectfully show the Court as follows:

## I.    INTRODUCTION

1.    This is an insurance dispute over coverage for Lamacar's loss of business income resulting from loss and damage to property operated by Lamacar's customers from the SARS-CoV-2 coronavirus, which causes the disease known as COVID-19.

2.    Lamacar is a premier gift shop supplier to more than 10,000 retail partners throughout the United States, including hospitals, hotels and resorts, casinos, independent pharmacies, Amazon resellers, and specialty boutiques.

3.    Cincinnati issued Commercial Package Policy No. EPP 046 98 51 to Lamacar for the period from November 15, 2019 to November 15, 2020.  The Policy includes a specific

"Expanded Coverage Plus Endorsement" providing a grant of coverage for "Business Income from Dependent Properties."

4.     This extension of coverage insures Lamacar's actual loss of net income (before taxes) sustained due to the necessary slowdown in Lamacar's business activities at its covered premises during a defined "period of restoration," provided that (1) the slowdown of Lamacar's operations is caused by direct, accidental physical loss to property; (2) such property is operated by others upon whom Lamacar depends to accept its products; and (3) the loss is not excluded by the Policy.

5.     Guidance from the Centers for Disease Control and the World Health Organization confirm that the Coronavirus is contained in and transmitted through respiratory droplets, which are found in the ambient air and on the surface of solid objects (a/k/a "fomites").

6.     When an infected person, whether symptomatic or asymptomatic, breathes, coughs, sneezes, talks, or sings, the expelled respiratory droplets containing the Coronavirus physically transform the air and surrounding property from a benign, non-hazardous state to a toxic, hazardous condition.

7.     Due to the specific morphology of the Coronavirus, including the characteristic spikes or clubs protruding from the virus's spherical casing, depending on the physical/chemical composition of the reactant surface, the Coronavirus chemically or ionically bonds with solids and particulate matter suspended in ambient air, resulting in a physical alteration of property.  The Coronavirus is not simply gravitationally at rest on property surfaces, but materially bonds with air and property, which is physically changed by its interaction with the Coronavirus.

8.      Since the inception of the COVID-19 pandemic in early 2020, individuals, including patrons, employees and/or vendors, infected with COVID-19 have shed the Coronavirus

into the ambient air and on the surfaces of solid materials, such as metal, wood, plastic, fabrics or glass, within the premises of Lamacar's customers, either through talking, sneezing, coughing or breathing.

9.      The spread of airborne contagion through suspended particulate matter and the viral infestation of property surfaces has caused physical loss and damage to the business premises operated by Lamacar's customers.  As a result of this loss and damage, Lamacar's customers have suspended or limited onsite retail operations.  This suspension of retail operations has, in turn, caused a slowdown in Lamacar's operations and the related loss of business income.  Through the end of 2020, Lamacar has lost thousands of dollars in revenue from thousands of individual customers, whose premises have become cankered by viral fomites and toxic air.

10.      There is no Policy exclusion removing viral blight and infestation from the Policy's covered causes of loss.

11.      Notwithstanding the Policy's coverage, the prevailing science surrounding the spread of COVID-19 and the interaction of the Coronavirus with both air and property, or the foregoing facts, Cincinnati has refused coverage for Lamacar's claim.

12.      Lamacar has accordingly brought this lawsuit against Cincinnati to recover its covered loss of income and related relief through claims for (1) breach of contract; (2) violations of Texas' Prompt Payment of Claims statute, Chapter 542 of the Texas Insurance Code; (3) breach of the duty of good faith and fair dealing; (4) violations of Chapter 541 of the Texas Insurance Code; and (5) attorneys' fees.

## II.      PARTIES

13.      Plaintiff Lamacar is a Texas corporation with its principal place of business at 3311 Boyington Dr., Ste 400, Carrollton, TX 75006.

14.     Defendant Cincinnati is an insurer doing business in Texas and is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Ohio.  Cincinnati may be served through its registered agent for service of process: National Registered Agents Inc., 1999 Bryan Street, Suite 900, Dallas TX 75201.

### III.     JURISDICTION & VENUE

15.     The foregoing allegations are incorporated herein by reference.

16.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because Cincinnati is not a citizen of any state of which Lamacar is also a citizen, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

17.     Cincinnati is a property and casualty insurer doing business in the Northern District of Texas, where Cincinnati regularly issues commercial property insurance and other insurance policies to other Texas insureds, like Lamacar.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Cincinnati resides in and is subject to personal jurisdiction in this district.

### IV.     CINCINNATI'S POLICY INSURES LOSS OF INCOME FROM DEPENDENT PROPERTIES

19.     The foregoing allegations are incorporated herein by reference.

20.     Cincinnati issued Commercial Package Policy No. EPP 046 98 51 to Lamacar for the period from November 15, 2019 to November 15, 2020 (the "Policy").  *See* Exhibit A.

21.     The Policy insures and promises payment for, among other things, direct loss to covered property at insured premises caused by or resulting from any non-excluded cause of loss.

22.     The Policy also insures and promises payment for the actual loss of business income Lamacar sustains due to the suspension of operations caused by direct loss to Lamacar's property from a non-excluded cause of loss.

23.     In addition to insuring Lamacar's loss of business income resulting from loss or damage to Lamacar's own covered property, Cincinnati's Policy includes expanded coverage for Lamacar's loss of business income resulting from loss or damage to the property of Lamacar's customers.

24.     The Policy's Commercial Property Coverage Part includes a Commercial Property "Expanded Coverage Plus Endorsement," which modifies the coverage extensions for "Business Income From Dependent Properties."

25.     Specifically, under the Expanded Coverage Plus Endorsement, Cincinnati promises to:

> [P]ay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."   The "suspension" must be caused by direct "loss" to "dependent properties" caused by or resulting from any Covered Cause of Loss.

26.     "Business Income" is defined as "Net Income (net profit or loss before income taxes) that would have been earned or incurred" and "continuing normal operating expenses sustained, including payroll."

27.     "Suspension" is defined, in relevant part, as "the slowdown or cessation of your business activities."

28.     "Operations" is defined as "your business activities occurring at the premises."

29.     "Period of restoration" is defined as "the period of time that begins at the time of direct 'loss'" and "ends on the earlier of the date when the property at the premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality; or the date when business is resumed at a new permanent location."

30.     "Loss" is defined as "accidental physical loss or accidental physical damage."

31.     "Dependent property" is defined as "property operated by others whom you depend on to … accept your products or services."

32.     "Covered Cause of Loss" is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."

33.     Applying the various definitions to the grant of coverage for Business Income from Dependent Properties in the Expanded Coverage Plus Endorsement, Cincinnati is obligated to pay for Lamacar's actual loss of net income (before taxes) sustained due to the necessary slowdown in Lamacar's business activities at its covered premises during a defined "period of restoration," provided that (1) the slowdown of Lamacar's operations is caused by direct, accidental physical loss to property; (2) such property is operated by others upon whom Lamacar depends to accept its products; and (3) the loss is not excluded by the Policy.

34.     The Policy's endorsed coverage for "Business Income from Dependent Properties" is subject to a sublimit of $5,000 per occurrence.  There is no Blanket Coverage Limit or aggregate limit for this coverage under the Policy.

**V.      LAMACAR'S CUSTOMERS HAVE SUSTAINED NON-EXCLUDED DIRECT PHYSICAL LOSS TO THEIR PROPERTIES RESULTING IN SUBSTANTIAL LOSS OF INCOME TO LAMACAR**

**A.      The SARS-CoV-2 "Coronavirus" Causes Loss And Damage To Property.**

35.     "COVID-19 is a respiratory disease caused by SARS-CoV-2, a new coronavirus discovered in 2019."[1]

36.     The SARS-CoV-2 virus is referred to as a "coronavirus."  The root word, "corona" means "crown."

---

[1] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *available at* https://www.cdc.gov/dotw/covid-19/index.html.

37.    This reference is used because of the unique morphology characteristic of the SARS-CoV-2 virus.  The Coronavirus is physically structured with viral RNA encased in a spherical lipid membrane from which "spike proteins"[2] protrude giving the virus the physical appearance of a crown, as depicted in the images below.



38.    The physical properties of SARS-CoV-2, including its distinctive spike proteins, dictate the physical interaction between the Coronavirus and both property and persons.[5]

39.    The spike proteins manifesting as "clubs" on the outside the virus are composed of various groups of amino acids, including $-NH_2$, $-NH_3^+$, $-COOH$ and $-COO^-$.[6]

---

[2] *See, e.g.*, Aydogdu, et al., *Surface interactions and viability of coronaviruses*, at 3, Fig. 3, J. R. SOC. INTERFACE (Dec. 7, 2020), *available at* https://royalsocietypublishing.org/doi/pdf/10.1098/rsif.2020.0798 ("[T]he SARS-CoV-2 coronavirus carries a different structure of proteins which are membrane glycoprotein (M), spike protein (S), haemagglutinin esterase (HE) and envelope (E) protein as shown in figure 3a and the nucleocapsid protein (N) can be found inside the lipid layer, which accompanies the viral RNA and protects it.").

[3] https://www.cdc.gov/sars/lab/images/coronavirus2.gif

[4] Adamcyzk, et al., *SARS-CoV-2 virion physicochemical characteristics pertinent to abiotic substrate attachment* Figure 1, CURRENT OPINION IN COLLOID & INTERFACE SCIENCE (Vol. 55 Jun 2, 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8169569/.

[5] *Id.* at 8 ("Charge distribution within protein molecules and their surfaces is a key factor in understanding their adsorption phenomena, which are often governed by electrostatics interactions. It should be noted that because of the heterogeneous charge distribution, proteins with negative net charge can efficiently adsorb on negatively charged surfaces. Therefore, the knowledge of charge distribution on SARS-CoV-2 S protein is of immense importance for prediction of its interaction with various surfaces.").

[6] Joonaki, et al., *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions*, at 2137, CHEM (Sept. 10, 2020), *available at* https://www.cell.com/chem/pdf/S2451-9294(20)30411-3.pdf ("Therefore, $-NH_2$, $-NH_3^+$, $-COOH$, and $-COO^-$ groups of amino acids in the SARS-CoV2 S protein drive adsorption onto the solid surfaces through double electrostatic interactions between the virion's ionized

40.     While subunits within the spike protein also play a role in binding with ACE2 receptors within human host cells,[7] the structure and chemical composition of the spike proteins determine how the Coronavirus bonds with different materials, including abiotic property.

41.     Depending on the surrounding pH values, positively charged $NH_3^+$ amino acid structures will be attracted to negatively charged metallic surfaces, like stainless steel or gold.[8]

42.     Other structures, like COOH can chemically bond with hydroxyl or oxygen-containing surfaces such as wood, cotton or glass.[9]  These molecular and chemical interactions are illustrated in the figure below.



surface-active species and the oppositely charged surfaces, as well as hydrogen bonding based on the surface characteristics.").

[7] Adhikari, et al., *Intra- and intermolecular atomic-scale interactions in the receptor binding domain of SARS-CoV-2 spike protein: implication for ACE2 receptor binding*, PHYSICAL CHEMISTRY CHEMICAL PHYSICS (Aug. 5, 2020), *available at* https://pubs.rsc.org/en/content/articlehtml/2020/cp/d0cp03145c ("The S-protein, consisting of subunits S1 and S2, plays a crucial role in the first contact between the virus and the ACE2 receptor. The S1 subunit binds to the host ACE2 receptor and the S2 subunit is activated by the host serine protease TMPRSS2, which promotes membrane fusion. Once inside the cell, SARS-CoV-2 hijacks the host to transcribe, replicate and translate its RNA genome into different virus proteins that are used to reassemble, encapsulate and exocytose the newly formed virions from the cell.").

[8] *Id*. at Fig. 2A.

[9] *Id*. at 1237-38 ("As denoted in Figure 2A, at pH values below the isoelectric point, the overall charge of SARS-CoV-2 could be positive, given that both the carboxylate and amine groups on the outer surface are protonated, and hydrogen bonding would be formed to hydroxyl-containing surfaces such as wood, cotton, or paper.").

43.    When an otherwise inert, abiotic surface is coated in water, including under conditions of high humidity, proteins on the surface of the Coronavirus can also form hydrogen bonds with the hydrophilic surface of the material.[10]

44.    The chemical, ionic and electrostatic interaction between the Coronavirus and different materials explains why the virus is known to persist on inanimate objects for days at a time.[11]    For example, according to one study, the Coronavirus was found in substantive concentrations on cloth for up to 24 hours, on steel for up to 48 hours, and on plastics for up to 72 hours:[12]



[10] *Id*. at 2139, Fig. 3A ("On the water-coated surfaces, the virus particles would establish strong interactions with the hydrophilic surface in the presence of a thin film water layer, mainly through hydrogen bonding.").
[11] *See, e.g.*, Aydogdu, et al., *Surface interactions and viability of coronaviruses*, at 4, Fig. 4, J. R. Soc. Interface (Dec. 7, 2020), *available at* https://royalsocietypublishing.org/doi/pdf/10.1098/rsif.2020.0798 ("At 21 to 23°C degrees of ambient temperature with 105.25 viral titre, steel, air, cardboard and copper were tested, and results indicated that the SARSCoV-2 was able to survive 3 h in air, 4 h on copper, 24 h on cardboard, 48 h on steel and more than 72 h on plastic. In addition, Chin et al. reported that persistence of the SARS-CoV-2 was 96 h on surgical masks and 24 h on cloth under 107.8 viral titre at 22°C." (citations omitted)).
[12] *Id*. at Figure 4.

45.     Other studies have found similar results, indicating that the Coronavirus can persist at infectious levels on plastics, metals and glass/ceramic/rubber respectively for up to 3-4 days, 3-4 days and 2 days.[13]

46.     The duration of Coronavirus adsorption on different materials also speaks ultimately to the risk of transmissibility.  According to one study, surface infection at one location in one hospital room was shown to spread to 41% of all surfaces sampled within the same hospital ward over a period of 10 hours.[14]  The same can be expected with respect to the transmission of the Coronavirus within a single contaminated property.

47.     When the Coronavirus bonds chemically or ionically with a surface, whether that surface be metal, wood, cotton, glass or another hydrophilic material, that surface is, by definition, physically altered and changed from a benign, sterile state to a toxic, infectious condition blighted with viral contagion.

48.     The electro-chemical bonding between the Coronavirus's spike proteins and abiotic property surfaces is similar to the interaction between the Coronavirus and organic host cells. During pathologic Coronavirus infection, the spike proteins bond with the angiotensin-converting enzyme (ACE2) receptor on the surface of living cells.[15]

---

[13] Aboubakr, et al., *Stability of SARS-CoV-2 and other coronaviruses in the environment and on common touch surfaces and the influence of climatic conditions: A review*, TRANSBOUNDARY & EMERGING DISEASES (Vol. 68 Mar. 2021), *available at* https://onlinelibrary.wiley.com/doi/10.1111/tbed.13707.

[14] *See* Rawlinson, et al., *COVID-19 pandemic – let's not forget surfaces*, at 1, Fig. 1, J. HOSP. INFECT. (May 20, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7238988/ ("The results showed that within 10 h, the surrogate had moved from the isolation room and transferred to 41% of all surfaces sampled within the ward, with a peak at 52% on Day 3 (Figure 1 ).").

[15] *See, e.g.*, Lan, et al., *Structure of the SARS-CoV-2 spike receptor-binding domain bound to the ACE2 receptor*, NATURE (March 2020), *available at* https://www.nature.com/articles/s41586-020-2180-5 ("Coronaviruses use the homotrimeric spike glycoprotein (comprising a S1 subunit and S2 subunit in each spike monomer) on the envelope to bind to their cellular receptors. Such binding triggers a cascade of events that leads to the fusion between cell and viral membranes for cell entry. Previous cryo-electron microscopy studies of the SARS-CoV spike protein and its interaction with the cell receptor ACE2 have shown that receptor binding induces the dissociation of the S1 with ACE2, prompting the S2 to transit from a metastable pre-fusion to a more-stable post-fusion state that is essential for membrane fusion. Therefore, binding to the ACE2 receptor is a critical initial step for SARS-CoV to enter into target cells."); Yang, et al., *Molecular interaction and inhibition of SARS-CoV-2 binding to the ACE2 receptor*, NATURE

49.    The ACE2 receptor is an enzyme composed of proteins, which typically facilitate the conversion of a complex protein substrate into smaller protein components.[16]  Although they depict the bonding between the Coronavirus and organic cells, to the extent that the chemical bonding is similar, the following images confirm that Coronavirus adhesion to abiotic materials, including metal, wood, fabrics and glass causes a physical alteration, though not visible to the naked eye:



50.    Studies have documented the physical changes to inorganic property from exposure to Coronavirus spike proteins.   As shown in the following atomic force microscopy (AFM) topographic images, surface roughness is measurably increased by adsorption of spike proteins:[19]

(May 14, 2021), *available at* https://www.nature.com/articles/s41467-020-18319-6 ("[W]e investigated the interaction established between the SARS-CoV-2 S glycoprotein and the ACE2 receptor using single-molecule force spectroscopy. We demonstrated a specific binding mechanism between the S1 subunit and the ACE2 receptor. By comparing the binding of the S1 subunit and the RBD toward the ACE2 receptor, our experiment evidenced that both domains interact with the same kinetic and thermodynamic properties toward the ACE2 receptor, highlighting that SARS-CoV-2 binding to ACE2 is dominated by the RBD/ACE2 interface.").

[16] Gheblawi, et al., *Angiotensin-Converting Enzyme 2: SARS-CoV-2 Receptor and Regulator of the Renin-Angiotensin System*, CIRCULATION RESEARCH (Apr. 23, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7188049/ ("ACE2 functions as a master regulator of the RAS mainly by converting Ang (angiotensin) I and Ang II into Ang 1–9 and Ang 1–7, respectively.").

[17] Caldas, et al., *Ultrastructural analysis of SARS-CoV-2 interactions with the host cell via high resolution scanning electron microscopy*, at Fig. 1, NATURE (Sept. 30, 2020), *available at* https://www.nature.com/articles/s41598-020-73162-5 ("Virus adhesion to the cell surface and SP (arrowheads) became more evident with the MOI of 0.1.").

[18] *Id*. at Fig. 4 ("In (C) a viral particle could be seen adhered to the edge of the microvilli-like structure (arrow) next to membrane ruffles (long arrow) surrounding SARS-CoV-2 particles (arrowheads).").

[19] Xie, et al., *A Nanochemical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces*, at Fig. 2, ACS APPL MATTER INTERFACES (Dec. 30, 2020), *available at*



Figure 2

AFM topography images (5 × 5 μm²) of glass, gold, SS, and PS before and after the adsorption of spike protein.

51.     Property exposed to SARS-CoV-2 also becomes more hydrophobic, *i.e.*, more likely to repel water, after interaction with the Coronavirus's spike proteins.[20]

52.     A similar physical transformation occurs as respiratory droplets contaminate ambient air when an infected person breathes, coughs, sneezes, sings or talks.[21]

53.     The Centers for Disease Control has confirmed that the Coronavirus is subject to airborne transmission, particularly in confined, indoor spaces, where "virus-containing respiratory

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7770894/?report=classic ("The bare glass, gold, SS, and PS surfaces exhibit a root-mean-square (RMS) roughness of 0.3–0.7 nm, and such smooth surfaces allow the accurate observation of protein adsorption.  It is noted that the uniform grainlike pattern on bare metal (i.e., gold and SS) surfaces is arising from their metal particles. After spike protein adsorption, all the surfaces become rough with the obvious binding of spike protein as indicated by the white dots shown in Figure2.").

[20] *Id.* at § 2.2, Fig. 3 ("[T]he water contact angle increases from 28.4° ± 0.6° for the AFM probe without protein modification to 40.2° ± 0.8° for the protein-functionalized AFM probe (inset of FigureFigure33A), which suggests that the AFM probe becomes relatively hydrophobic after the protein modification.").

[21] World Health Organization, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (July 9, 2020), *available at* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions ("Current evidence suggests that transmission of SARS-CoV-2 occurs primarily between people through direct, indirect, or close contact with infected people through infected secretions such as saliva and respiratory secretions, or through their respiratory droplets, which are expelled when an infected person coughs, sneezes, talks or sings.").

droplets comprised of smaller droplets and particles … can remain suspended in the air over long distances (usually greater than 6 feet) and time (typically hours)."[22]

54.     The mechanism for airborne transmission again illustrates the physical-chemical change in atmospheric composition that is characteristic of "physical loss and damage" under even the most constrained meaning of those terms.

55.     Just as the spike proteins dotting the outer shell of the Coronavirus become chemically and electrostatically adsorbed on various solid surfaces, like metals, metal, wood, fabrics and glass,[23] the same spike proteins react with particulate matter in respiratory droplets and in the ambient air, including minerals, soot or plastics, to remain airborne over extended periods of time.[24]

56.     In one study, researchers documented the presence of SARS-CoV-2 RNA on airborne particulate matter sampled from an industrial area in Bergamo, Italy.[25]

57.     The interaction between the Coronavirus and ambient airborne particulate matter is corroborated by data suggesting that the incidence of human COVID-19 infection is higher in

---

[22] Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (Oct. 5, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html#:~:text=Airborne%20transmission%20is%20infection%20spread,(typically%20hours) ("Contact transmission is infection spread through direct contact with an infectious person (e.g., touching during a handshake) or with an article or surface that has become contaminated. The latter is sometimes referred to as "fomite transmission.").

[23] *See supra* notes 11-13.

[24] Duval, et al., *Chemodynamic features of nanoparticles: Application to understanding the dynamic life cycle of SARS-CoV-2 in aerosols and aqueous biointerfacial zones*, ADV. COLLOID INTERFACE SCI. (Apr. 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7931671/ ("Virions that are shed in respiratory droplets may sorb to PM that is initially present in the respiratory droplet or encountered during the droplet's trajectory through the atmosphere. Airborne PM is heterogeneous in size and chemical composition, comprising a diverse range of inorganic and organic materials, e.g. minerals, soot, plastics, as well as various sorbed species."); *see also* Liu, et al., *Aerodynamic characteristics and RNA concentration of SARS-CoV-2 aerosol in Wuhan hospitals during COVID-19 outbreak*, BIORXIV (Mar. 10, 2020), *available at* https://www.biorxiv.org/content/10.1101/2020.03.08.

[25] Setti, et al., *SARS-CoV-2 RNA found on particulate matter of Bergamo in Northern Italy: First evidence*, ENVIRONMENTAL RESEARCH (Sept. 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7260575/ ("This is the first evidence that SARS-CoV-2 RNA can be present on outdoor particulate matter, thus suggesting that, in conditions of atmospheric stability and high concentrations of PM, SARS-CoV-2 could create clusters with outdoor PM and – by reducing their diffusion coefficient – enhance the persistence of the virus in the atmosphere." (citations omitted)).

regions suffering from low air quality.[26]  In any event, the chemical, ionic, or other physical bonding between the Coronavirus and existing airborne particulate matter constitutes a physical alteration or change in the ambient air.

58.     Regardless of the mechanism, the physical alteration of the extended atmosphere surrounding infected persons has also been documented, including in one study measuring airborne viral shedding in a quarantine unit at the University of Nebraska Medical Center:[27]

---

[26] Duval, et al., *Chemodynamic features of nanoparticles: Application to understanding the dynamic life cycle of SARS-CoV-2 in aerosols and aqueous biointerfacial zones*, ADV. COLLOID INTERFACE SCI. (Apr. 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7931671/ ("Under conditions where V-PM is dynamic, our analysis further indicates that PM2.5 may serve as a shuttle for delivery of SARS-CoV-2 to ACE2 receptors in lung epithelia. Our theoretical setting thus makes a connection between air quality and the contribution of V-PM associates to the magnitude of the dose of virions transmitted to alveolar host cells. Such connection is in line with reported correlations between episodes of air pollution and outbreaks of COVID-19."); *see also* Farhangrazi, *Airborne Particulate Matter and SARS-CoV-2 Partnership: Virus Hitchhiking, Stabilization and Immune Cell Targeting – A Hypothesis*, FRONTIERS IN IMMUNOLOGY (Sept. 24, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7543093/#B10 ("A number of recent studies have suggested some correlations between air pollution and coronavirus disease-2019 (COVID-19) cases and deaths. For instance, a recent epidemiological study concluded that an increase of 1 μg/m3 in long-term exposure to fine PM air pollutants (≤2.5 μm, PM2.5) is associated with an 8% increase in COVID-19 mortality rate in the United States." (citations omitted)).

[27] Santarpia, et al., *Aerosol and surface contamination of SARS-Cov-2 observed in quarantine and isolation care*, at Fig. 2, SCIENTIFIC REPORTS (July 29, 2020), *available at* https://www.nature.com/articles/s41598-020-69286-3 ("Results of SARS-CoV-2 cell culture experiments. Images and graphs describe the results of cell culture of two environmental samples. The two samples are shown: an air sample from the NQU hallway on day 8 (A, C, E), the windowsill from NQU A onday 1 (B, D, F). Cytopathic effect observed in these samples (A, B) is generally mild, compared to the control (top center) which had no environmental sample added. RT-qPCR from daily withdrawals of 100 μL of supernatant from the cell culture of each sample indicates changes in viral RNA in the supernatant throughout cultivation. The hallway air sample indicates a decrease in RNA concentration in the supernatant over the first 2 days, consistent with the withdrawal of supernatant for analysis. Increase in concentration is observed on both days 3 and 4 (C). The windowsill sample showed stable and possible increasing viral concentrations for the first 3 days, despite the withdrawal of supernatant for analysis (D). Immunofluorescent staining of the hallway air sample indicates the presence of SARS-CoV-2, after 3 days of cell culture (E), as compared to control cells (inset), which were not exposed to any environmental sample. TEM images of the lysates from the windowsill culture (F) clearly indicate the presence of intact SARS-CoV-2 virions, after 3 days of cell culture."); *see also* Santarpia, et al., *Transmission potential of SARS-CoV-2 in viral shedding observed at the University of Nebraska Medical Center*, MEDRXIV (Mar. 26, 2020), *available at* www.medrxiv.org/content/10.1101/2020.03.23.20039446v2.



59.     During the summer of 2020, in the midst of climbing infections, hospitalizations

and deaths, 239 scientists in 32 countries urged the WHO to consider evidence that "[w]hether

carried aloft by large droplets that zoom through the air after a sneeze, or by much smaller exhaled

droplets that may glide the length of a room . . . , the coronavirus is borne through the air and can infect people when inhaled."[28]

60.     Days later, the WHO issued updated guidance on COVID-19 transmission, which acknowledged the following:

- Current evidence suggests that transmission of SARS-CoV-2 occurs primarily between people through direct, indirect, or close contact with infected people through infected secretions such as saliva and respiratory secretions, or through their respiratory droplets, which are expelled when an infected person coughs, sneezes, talks or sings.

- Airborne transmission of the virus can occur in health care settings where specific medical procedures, called aerosol generating procedures, generate very small droplets called aerosols. Some outbreak reports related to indoor crowded spaces have suggested the possibility of aerosol transmission, combined with droplet transmission, for example, during choir practice, in restaurants or in fitness classes.

- Based on what we currently know, transmission of COVID-19 is primarily occurring from people when they have symptoms, and can also occur just before they develop symptoms, when they are in close proximity to others for prolonged periods of time. While someone who never develops

---

[28] Apoorva Mandavilli, *239 Experts With One Big Claim: The Coronavirus Is Airborne*, THE NEW YORK TIMES (July 4, 2020), *available at* https://www.nytimes.com/2020/07/04/health/239-experts-with-one-big-claim-the-coronavirus-is-airborne.html.

symptoms can also pass the virus to others, it is still not clear to what extent

this occurs[,] and more research is needed in this area.[29]

61.     Therefore, when an infected person—whether symptomatic or asymptomatic—

coughs, sneezes, talks, sings or breathes, toxic virions physically, if not chemically, alter the

ambient breathable air and constituent particulate matter.

62.     While contaminated respiratory droplets and infested particulate matter may remain

airborne for extended periods, once fallen from airborne suspension and deposited on solid

property, the Coronavirus can physically bond with, alter and contaminate metal, wood, plastics,

fabrics, glass and other materials leaving such property susceptible to further transmission of

COVID-19.[30]

**B.     Lamacar's Customers Have Sustained Loss And Damage To Property From
The Coronavirus.**

63.     The COVID-19 pandemic and ensuing public health crisis is believed to have

originated in Wuhan, China, where the first diagnoses were made in December 2019.[31]

64.     By January 2020, the first domestic coronavirus case was reported in Washington

state.[32]

---

[29] World Health Organization, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (July 9, 2020), *available at* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.
[30] *See* Rawlinson, et al., *COVID-19 pandemic – let's not forget surfaces*, at 1, Fig. 1, J. HOSP. INFECT. (May 20, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7238988/ ("The results showed that within 10 h, the surrogate had moved from the isolation room and transferred to 41% of all surfaces sampled within the ward, with a peak at 52% on Day 3 (Figure 1 ).").
[31] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, THE NEW YORK TIMES (Aug. 6, 2020), *available at* https://www.nytimes.com/article/coronavirus-timeline.html.
[32] Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus in the United States*, NEW ENGLAND JOURNAL OF MEDICINE (Mar. 5, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2001191.

65.     Before the end of January 2020, the World Health Organization ("WHO") had declared a global health emergency.[33]   The United States Department of Health and Human Services also declared a public health emergency on the same day.[34]

66.     Over the next six weeks, the number of cases, deaths and affected countries continued to the climb to the point that the WHO "made the assessment that COVID-19 can be characterized as a pandemic."[35]

67.     Two days later, on March 13, 2020, President Trump issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency."[36]

68.     State and local governments soon followed suit by issuing a range of shelter-in-place, quarantine and lockdown orders.

69.     Many of these civil authority orders include specific findings that the coronavirus causes physical loss and damage to property.  For example, and without limitation, the March 31, 2020 Order issued by Judge Clay Jenkins for Dallas County states that "[t]he COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time."[37]

---

[33] World Health Organization, *Novel Coronavirus (2019-nCoV), Situation Report-11* (Jan. 31, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200131-sitrep-11-ncov.pdf?sfvrsn=de7c0f7_4.

[34] Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), *available at* https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

[35] World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[36] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[37] *See* Amended Order of County Judge Clay Jenkins (Mar. 31, 2020), *available at* https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/2020/march/033120-DallasCountyOrder.pdf.

70.     To date, there have been more than 33 million confirmed COVID-19 cases in the United States and at least 605,426 deaths attributed to COVID-19.[38]

71.     Particularly hard hit by the COVID-19 pandemic have been hospitals and healthcare workers responding to surging infection rates.[39]

72.     Hundreds of thousands of doctors, nurses and supporting staff have become infected, and thousands of health care workers have died from COVID-19.[40]

73.     Among those hospitals devastated by rising COVID-19 infection rates are many of Lamacar's customers.

74.     Lamacar provides gift shop inventory to more than 10,000 customers across all fifty states, the District of Columbia and Puerto Rico.

75.     The majority of Lamacar's customers are hospitals.  Other customers include, but are not limited to, pharmacies, casinos, hotels, universities, retirement and senior centers, and VA Canteens.

---

[38] Jordan Allen, et al., *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (July 8, 2021), *available at* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 8, 2021).

[39] *See, e.g.*, Christina Jewett and Robert Lewis, *As the Terror of COVID Struck, Health Care Workers Struggled to Survive.    Thousands Lost the Fight*, KAISER HEALTH NEWS (Dec. 23, 2020), *available at* https://khn.org/news/article/as-the-terror-of-covid-struck-health-care-workers-struggled-to-survive-thousands-lost-the-fight/.

[40] Chris Dall, *Health agency: COVID-19 hitting health workers hard in Americas*, UNIVERSITY OF MINNESOTA, CENTER FOR INFECTIOUS DISEASE RESEARCH AND POLICY (Sept. 2, 2020), *available at* https://www.cidrap.umn.edu/news-perspective/2020/09/health-agency-covid-19-hitting-health-workers-hard-americas ("PAHO Director Carissa Etienne, MBBS, MSc, said that nearly 570,000 healthcare workers in the Americas have fallen ill with COVID-19, and more than 2,500 have died."); William A. Haseltine, *Nearly 300,000 Healthcare Workers Have Been Infected With COVID-19 Worldwide, Threatening Health Systems*, FORBES (Nov. 17, 2020), *available at* https://www.forbes.com/sites/williamhaseltine/2020/11/17/the-infection-of-hundreds-of-thousands-of-healthcare-workers-worldwide-poses-a-threat-to-national-health-systems/?sh=161240aa3499 ("A study recently published in the International Journal of Infectious Diseases from thirty-seven countries found that nearly 300,000 healthcare workers had been infected with Covid-19. In addition to the high number of infections, over 2,500 healthcare workers died from the virus as of August 15th."); Soumya Karlamangla, *Thousands of L.A. healthcare workers sickened by coronavirus, worsening crisis in hospitals*, L.A. TIMES (Jan. 6, 2021), *available at* https://www.latimes.com/california/story/2021-01-06/covid-19-surge-infecting-la-healthcare-workers-in-huge-numbers ("Since the pandemic began, 28,448 healthcare workers and first responders have tested positive for the coronavirus in L.A. County, and 132 have died from the virus, Ferrer said. Hospitals, nursing homes and outpatient clinics account for the majority of cases.").

76.     Lamacar provides gift shop inventory to Christus Health in Texas.  Christus Health has treated scores of COVID-19 patients at its facilities in 2020 and 2021.[41]

77.     Lamacar sells gift shop merchandise to Prisma Health in South Carolina.  At its peak in January 2021, Prisma Health received as many as 550 COVID-19 inpatients daily.[42]  Since then and through the Spring of 2021, Prisma Health has continued to treat hundreds of patients infected with COVID-19 on a daily basis.[43]

78.     Lamacar also provides gift shop inventory to Texas Children's Hospital in Houston, Texas.  Texas Children's Hospital has treated dozens of COVID-19 patients during the course of the pandemic.[44]

79.     Another Lamacar customer, Parkland Hospital in Dallas established COVID-19 intensive care units and has, until recently, served as the largest single-site treatment center for COVID-19 patients in North Texas.[45]

---

[41]     Christus Health, *Our continued commitment to you* (Jun. 26, 2020), *available at* https://www.christushealth.org/southeast-texas/about/news/covid-19 ("The increase of COVID-19 patients admitted to our area hospitals pose extra challenges to the already critical work our caregivers are facing. While community spread continues to increase, this places additional risk to our health care workers who treat these patients."); Christus Health, *CHRISTUS Southeast Texas Health System Responds to Gov. Abbott's Latest Executive Orders* (Dec. 22, 2020), *available at* https://www.christushealth.org/southeast-texas/about/news/covid-19 ("Like the entire region and health care facilities across the country, CHRISTUS Southeast Texas Health System is seeing an increase in the number of cases of COVID-19 and a rise in COVID patients in our hospitals.").

[42] Prisma Health North Greenville Hospital transitions back to long-term acute-care unit (Apr. 22, 2021), *available at* https://prismahealth.org/patients-and-guests/news/prisma-health-north-greenville-hospital-transitions-back-to-long-term-acute-care-unit ("During the last several weeks, Prisma Health's number of COVID-19 inpatients has hovered around 100 per day, down significantly since January's peak of 550 inpatients per day.").

[43] *Id.*

[44] Texas Children's publishes paper detailing care of COVID-19 patients (Jun. 23, 2020), *available at* https://www.texaschildrens.org/texas-children%E2%80%99s-publishes-paper-detailing-care-covid-19-patients ("Interim Physician-in-Chief Dr. James Versalovic and several other Texas Children's physicians recently published a paper in the Oxford Academic: The Journal of the Pediatric Infectious Diseases Society detailing the clinical course of 57 children with COVID-19 cared for at Texas Children's at the beginning of the pandemic.").

[45] Parkland Closes Its COVID-19 Units, Marking Major Milestone (Mar. 26, 2021), *available at* https://www.nbcdfw.com/news/coronavirus/parkland-closes-its-covid-19-units-marking-major-milestone/2587364/ ("North Texas reached a historic and symbolic milestone in the fight against COVID-19. Tuesday morning, Parkland Hospital closed its COVID-19 intensive care units.  Parkland has served as the largest single-site treatment center for COVID-19 patients in North Texas."); Nic Garcia, *Dallas' Parkland hospital is 'completely full' with COVID patients, top doctor says*, DALLAS MORNING NEWS (Dec. 29, 2020), *available at* https://www.dallasnews.com/news/public-health/2020/12/29/dallas-parkland-hospital-is-completely-full-with-covid-patients-top-doctor-says/                    ("Dallas

80.     Mary Washington Hospital in Virginia—another Lamacar customer—likewise has treated dozens of patients suffering from COVID-19 during the course of the pandemic.[46]

81.     Lamacar customer, Vidant Medical Center in North Carolina, is currently treating dozens of COVID-19 inpatients,[47] as it has throughout the pandemic.[48]

82.     Forsyth Medical Center in Winston-Salem, North Carolina, another Lamacar customer, has admitted hundreds of COVID-19 patients for treatment in 2020 and 2021.[49]

83.     Lamacar customer, Reading Hospital, treated hundreds of COVID-19 patients at its Reading, Pennsylvania facilities throughout 2020.[50]

---

County's public hospital is at a dire tipping point, with more COVID-19 patients than at any time during the pandemic and more intensive care patients than it has ever served, health officials said Tuesday.").

[46] Cathy Dyson, *Fredericksburg-area hospitals restricting visitors because of increasing virus cases*, THE FREE LANCE-STAR (Dec. 31, 2020), *available at* https://fredericksburg.com/news/local/fredericksburg-area-hospitals-restricting-visitors-because-of-increasing-virus-cases/article_d135b341-d0df-5a21-aabd-d536483a2309.html ("All three hospitals in the Fredericksburg area are restricting visitors as COVID-19 cases—and hospitalizations—continue to set records. Spotsylvania Regional Medical Center put the restrictions in place on Monday, and Mary Washington Hospital and Stafford Hospital started them with the new year. … The tighter restrictions come as more than 90 patients are being treated for virus symptoms at all three facilities.").

[47] *See* https://www.vidanthealth.com/covid-19/ ("Number of confirmed COVID-19 inpatients currently at Vidant Health: 28 *As of July 8th 2021, 11:59 p.m.").

[48] Emily Ceravarich, *Vidant Medical president asks for public's help as COVID-19 cases soar, impact hospital*, WNCT (Dec. 22, 2020), *available at* https://www.wnct.com/health/coronavirus/vidant-medical-president-asks-for-publics-help-as-covid-19-cases-soar-impact-hospital/ ("Federal records show 84% of intensive care unit beds at Vidant Medical Center in Greenville are full. The hospital's president, William Brian Floyd, said people taking measures to avoid spreading COVID-19, like wearing masks and avoiding gatherings will save lives. It will also make things easier for stressed healthcare workers. "We have in fact seen our highest numbers of hospitalized patients," Floyd said. "Today we have about 165 or so in the hospital. But we are also seeing the highest percent positive we've seen so far which is somewhere between 15 and as high as 18 percent.").

[49] Richard Craver, *Forsyth adds 199 new COVID cases*, WINSTON-SALEM JOURNAL (Jan. 11, 2021), *available at* https://journalnow.com/news/local/forsyth-adds-199-new-covid-cases/article_ae7a040e-5424-11eb-82b8-cb3cb2800ab0.html ("The N.C. Department of Health and Human Services reported Monday that Forsyth had 199 new COVID-19 cases, down from 248 reported Sunday and a record 430 reported Saturday.").

[50] Reading Hospital marks release of 500th COVID-19 patient, WFMZ (Sept. 22, 2020), *available at* https://www.wfmz.com/news/area/berks/reading-hospital-marks-release-of-500th-covid-19-patient/article_87cf7c12-fcdb-11ea-a063-4bb1109e44ff.html ("The hospital announced Tuesday that it has sent home its 500th patient to recover from COVID-19 since Berks County's first case of the virus was reported by Pennsylvania health officials on March 18.").

84.      Johns Hopkins Bayview Medical Center in Baltimore, Maryland—another Lamacar customer—has treated more than 2,300 COVID-19 patients since the onset of the pandemic in March 2020.[51]

85.      Lamacar customer, University of Iowa Hospitals & Clinics, has similarly treated hundreds of COVID-19 inpatients during the course of the pandemic.[52]

86.      Other Lamacar customers, including the following hospitals have also treated COVID-19 patients and been exposed to the Coronavirus on their premises:

- Children's Hospital of Philadelphia;[53]

- CAMC General Hospital in Charleston, West Virginia;[54]

- Brigham & Women's Hospital in Boston, Massachusetts;[55]

- UT Health Tyler in Tyler, Texas;[56]

---

[51] Johns Hopkins Medicine, *COVID-19 Daily Report from Johns Hopkins Medicine* (July 7, 2021), *available at* https://www.hopkinsmedicine.org/coronavirus/covid-19-daily-report.html (showing "Cumulative # of Confirmed COVID-19 Patients Tested, 03/09/2020 – 7/7/2021" and 2,326 for Johns Hopkins Bayview Medical Center).

[52] Brooks Jackson, *We stand ready to lead Iowa through the COVID crisis*, UNIVERSITY OF IOWA HOSPITALS & CLINICS (Nov. 25, 2020), *available at* https://uihc.org/news/we-stand-ready-lead-iowa-through-covid-crisis ("Here at University of Iowa Hospitals & Clinics, the number of COVID-positive cases on Nov. 24 stood at 102 out of 489 symptomatic patients tested—a 21% positivity rate. This number is considerably lower than our peak of 221 positive cases tested on Nov. 5 (30% positivity rate). Our number of COVID inpatients on Nov. 24 was 77, which is down 22% from a peak of 99 just last week.").

[53] Berkeley Lovelace Jr., *More young people are getting hospitalized as Covid variants spread. Here's what we know*, CNBC (Apr. 16, 2021), *available* at https://www.cnbc.com/2021/04/16/covid-more-young-people-hospitalized-as-more-contagious-variants-spread.html ("Dr. Paul Offit, a physician at Children's Hospital of Philadelphia, said he is now seeing more patients with a rare inflammatory condition, a complication of Covid-19, than he has ever witnessed since the pandemic began.").

[54] Jeff Jenkins, *60 COVID-19 patients at CAMC and climbing*, WV METRO NEWS (Sept. 14, 2020), *available at* https://wvmetronews.com/2020/09/14/60-covid-19-patients-at-camc-and-climbing/ ("There were 60 COVID-19 patients being treated in Charleston Area Medical Center hospitals Monday, the largest single day COVID-19 patient census for CAMC since the pandemic began.").

[55] Brigham & Women's Hospital, *Information and Resources for Media about COVID-19* (Oct. 16, 2021), *available at* https://www.brighamandwomens.org/covid-19/for-media ("Number of COVID-19 inpatients: 15, Number of COVID-19 patients requiring intensive care: 3, Number of admitted PUIs: 13, Brigham Health Employees testing positive: 426).

[56] Blake Holland, *East Texas hospital leader worries lifting restrictions could trigger 'comeback' in COVID-19 cases, hospitalizations* KSLA (Mar. 3, 2021), *available at* https://www.ksla.com/2021/03/04/east-texas-hospital-leader-worries-lifting-restrictions-could-trigger-comeback-covid-cases-hospitalizations/ ("As of Tuesday, 24 people were in UT Health's Tyler hospital with active cases of COVID-19, and about 50 patients were being treated for the virus across the entire system, according to Cummins.").

- New Hanover Regional Medical Center in Wilmington, North Carolina;[57]

- Maimonides Medical Center in Brooklyn, New York;[58]

- Adventists Healthcare Shady Grove Medical Center in Rockville, Maryland;[59]

- St. Francis Hospital in Tulsa, Oklahoma;[60]

- CJW Medical Center in Richmond, Virginia;[61] and

- FirstHealth Moore Regional Hospital at Pinehurst, North Carolina.[62]

87.    On information and belief, each of Lamacar's customers have been exposed to the Coronavirus during the course of the pandemic, including through the presence of employees, vendors and/or patrons infected with COVID-19.[63]

---

[57] Emily Featherston, *NHRMC adjusting as virus hospitalizations surge*, WECT (Jan. 11, 2021), *available at* https://www.wect.com/2021/01/11/nhrmc-adjusting-virus-hospitalizations-surge/ ("The number of COVID-19 patients hospitalized at New Hanover Regional Medical Center is as high as it's been during the entire pandemic, with the daily average of patients increasing to 68.").

[58] "I've never seen it like this," UC DAVIS HEALTH MAGAZINE (Fall 2020), *available at* https://health.ucdavis.edu/health-magazine/issues/fall2020/features/never-seen-it-like-this.html ("When Haines appeared in the news again this April, during a weeklong national news report inside hard-hit Maimonides, the novel coronavirus had caused nearly as many U.S. deaths in just two months — including more than 700 in a single Big Apple day. … At times, his hospital in the virus epicenter was caring for 600 coronavirus cases at once.").

[59] *COVID-19 Hospital Capacity, Adventist Healthcare Shady Grove Medical Center*, RENO GAZETTE JOURNAL (June 25, 2021), *available at* https://data.rgj.com/covid-19-hospital-capacity/facility/adventist-healthcare-shady-grove-medical-center/210057/ (showing hospital bed occupancy for adult and pediatric COVID-19 patients between July 31, 2020 and June 25, 2021).

[60] *COVID-19 Hospital Capacity, Saint Francis Hospital South, LLC (Tulsa, OK)*, RENO GAZETTE JOURNAL (June 25, 2021), *available at* https://data.rgj.com/covid-19-hospital-capacity/facility/saint-francis-hospital-south-llc/370218/ (showing hospital bed occupancy for adult and pediatric COVID-19 patients between July 31, 2020 and June 25, 2021).

[61] *COVID-19 (Coronavirus) Hospitalizations, CJW Medical Center (Richmond, VA)*, PORT CLINTON NEWS HERALD (June 25, 2021), *available at* https://data.portclintonnewsherald.com/covid-19-hospital-capacity/facility/cjw-medical-center/490112/ (showing hospital bed occupancy for adult and pediatric COVID-19 patients between July 31, 2020 and June 25, 2021).

[62] *COVID-19 (Coronavirus) Hospitalizations FirstHealth Moore Regional Hospital (Pinehurst, NC)*, EVENING SUN (June 25, 2021), *available at* https://data.eveningsun.com/covid-19-hospital-capacity/facility/firsthealth-moore-regional-hospital/340115/ (showing hospital bed occupancy for adult and pediatric COVID-19 patients between July 31, 2020 and June 25, 2021).

[63] Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere,* WASHINGTON POST (Jun. 25, 2020), *available at* https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ ("At the population level, in other words, the virus is almost literally everywhere, turning the epidemic into a crisis directly affecting the lives of nearly every single person in the United States.").

88.     As these individuals have engaged in normal respiratory function while on Lamacar's customers' premises—either through talking, sneezing, coughing or breathing—respiratory secretions and droplets containing the Coronavirus have entered, contaminated and physically altered the ambient air circulating inside and around the premises of Lamacar's customers, as described above.

89.     Respiratory secretions and virus-containing respiratory droplets have also contaminated and physically altered the surfaces of real and personal property at each of Lamacar's customers, as described above.

90.     Despite measures taken to avoid and remediate exposure to COVID-19, including face masks, air filtration, regular cleaning and sanitization, social distancing, and the erection of barriers and crowd control features, exposure to the Coronavirus from human carriers and the accompanying contamination and physical/chemical alteration of ambient air and solid property at Lamacar's customers has continued throughout 2020 and into 2021.

91.     The viral infestation and alteration of air and property at Lamacar's customers with the Coronavirus constitutes physical loss and damage to Lamacar's customers, upon whom Lamacar depends for the sale of its gift shop supplies.

92.     Upon information and belief, the incidence of the Coronavirus at one customer's premises has not caused exposure to COVID-19 at any other customer's premises.  As a result, the physical loss and damage occurring at each of Lamacar's customers' premises constitutes a separate and independent "occurrence" for purposes of the Policy's coverage for Business Income from Dependent Properties.

93.     Without assuming any burden of proof as to any exclusion or exception to coverage, Cincinnati's Policy contains no provision that would render exposure to the Coronavirus outside of the Policy's Covered Causes of Loss.

94.     The incidence of COVID-19 cases and the related exposure to the Coronavirus at individual customer locations has prompted these clients to limit operations.   Hospitals, for example, with high COVID-19 caseloads have restricted visitors from coming onsite to varying degrees throughout the pandemic.[64]   At the same time, ancillary patient/visitor services, including retail offerings, have been curtailed or closed altogether.

95.     As a result of COVID-19 exposure on the premises, non-hospital clients, including hotels, casinos, pharmacies and other retail stores, have likewise reduced or suspended retail sales requiring Lamacar's products.

96.     Hundreds of Lamacar's customers have permanently gone out of business since the start of the COVID-19 pandemic.

97.     Thousands of Lamacar's customers have temporarily reduced operations or completely closed onsite gift shops as a direct result of exposure to the Coronavirus.

98.     Because of the COVID-19-related reduction in retail operations, Lamacar's customers similarly reduced or stopped ordering gift shop merchandise from Lamacar.

99.     As a direct result of the COVID-19-related loss and damage to Lamacar's customers' premises, and the ensuing reduction and suspension of such customers' retail

---

[64] *See, e.g.*, Cathy Dyson, *Fredricksburg-area hospitals restricting visitors because of increasing virus cases*, THE FREE LANCE-STAR (Dec. 31, 2020), *available at* https://fredericksburg.com/news/local/fredericksburg-area-hospitals-restricting-visitors-because-of-increasing-virus-cases/article_d135b341-d0df-5a21-aabd-d536483a2309.html ("With the drastic rise in COVID-19 cases in our community and under our care in our hospitals and facilities, it is in the best interest for the safety of our staff, providers, and patients to restrict visitation at this time," said Dr. Christopher Newman, chief medical officer for Mary Washington Healthcare.").

operations, Lamacar's business activities at its covered premises in Carrollton, Texas have been significantly impacted.

100.    Lamacar's sales operations have been materially reduced in response to the loss and damage sustained by its customers from the COVID-19 pandemic.

101.    Year-over-year sales from Lamacar's customers in 2020, relative to 2019, fell by an average of 70%.

102.    Lamacar's aggregate revenues in 2020 fell by more than $24.477 million compared to 2019.

103.    Consequently, during 2020 and into 2021, Lamacar has suffered a dramatic loss of net income due to the necessary slowdown in Lamacar's business activities at its Carrollton, Texas location resulting from non-excluded direct physical loss and damage to the property of Lamacar's customers, upon whom Lamacar depends to accept its gift shop supplies.

## VI.    CINCINNATI HAS IMPROPERLY FAILED AND REFUSED TO PROVIDE COVERAGE FOR LAMACAR'S CLAIM

104.    Lamacar submitted a claim to Cincinnati under the Policy on or about March 17, 2020 (the "Claim").

105.    Cincinnati issued reservation of rights letters in March and April 2020.  Cincinnati's correspondence in 2020 requested information about the presence of the Coronavirus at Lamacar's property, as well as civil authority orders requiring the closure of or restricting access to Lamacar's insured premises.  Cincinnati did not request or investigate loss or damage to any dependent property, including any of Lamacar's customers.

106.    On February 16, 2021, Lamacar urged coverage under the Policy's Expanded Coverage Plus Endorsement.  In this correspondence, Lamacar provided a list of more than 5,000

dependent properties, who have been exposed to the Coronavirus during the COVID-19 pandemic. The list also documented Lamacar's loss of revenue corresponding to each dependent property.

107.    Nearly two months later, on April 12, 2021, Lamacar's outside counsel responded by refusing coverage for Lamacar's Claim.

108.    Cincinnati's April 12, 2021 letter does not respond to the fundamental premise of Lamacar's Claim that its customers—those businesses upon whom Lamacar depends to accept its products—have been exposed to the Coronavirus through patrons, employees and/or contractors, which exposure has caused direct physical loss or damage to Lamacar's customers' property, which in turn has caused these dependent properties to limit and suspend their business operations.

109.    Instead, for ten pages, Cincinnati recites irrelevant provisions from the Policy, which were not even referenced in Lamacar's February 16, 2021 correspondence.  In the only reference to the Policy's coverage for Business Income from Dependent Properties, Cincinnati tersely asserts that "Cincinnati has not been provided with any evidence of direct physical loss or damage to dependent properties from a Covered Cause of Loss."

110.    Nowhere in Cincinnati's April 12, 2021 letter is there any acknowledgement or response to the fact that Lamacar's clients have been exposed to the Coronavirus or that this exposure has caused damage requiring Lamacar's customers to curtail their business operations resulting in loss of revenue to Lamacar.

111.    Instead, Cincinnati asserts that "even assuming that there was direct physical loss or physical damage, the loss is excluded" by (1) a provision excluding coverage for loss caused by "the enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any building or structure"; (2) a provision denying payment for loss caused by "delay, loss of use or loss of market"; and (3) a provision excluding coverage for loss caused by "acts or

decisions, including the failure to act or decide, of any person, group, organization or governmental body."

112.    Nowhere in Cincinnati's April 12, 2021 letter is there any explanation, including any factual basis or legal authority, to justify Cincinnati's decision to deny coverage for the Claim under the aforementioned exclusions.

113.    On information and belief, Cincinnati has done nothing to investigate the details of Lamacar's Claim, including the loss and damage suffered by Lamacar's customers or the resulting impact on Lamacar's business operations at its insured premises in Carrollton, Texas.   Instead, Cincinnati has delayed and refused to acknowledge the coverage that is owing under the Policy for Lamacar's Claim.

114.    Cincinnati's conduct has caused substantial damages to Lamacar.

## VII.    CAUSES OF ACTION

**A.    Breach of Contract**

115.    The foregoing allegations are incorporated herein by reference.

116.    The Policy is a valid, enforceable contract.

117.    Lamacar is insured under the Policy.

118.    Lamacar has satisfied all conditions under the Policy.

119.    The terms of the Policy unambiguously require Cincinnati to provide Lamacar coverage for Lamacar's Claim.   Alternatively, the terms of the Policy are ambiguous and must be construed in favor of coverage for Lamacar's Claim.

120.    Cincinnati has breached the Policy by failing to pay or acknowledge coverage for Lamacar's Claim.

121.     As a direct and proximate result of Cincinnati's breach of contract, Lamacar has been deprived of the benefits of the Policy and has incurred damages, the amount of which shall be determined at trial, plus interest.

**B.     Chapter 541 of the Texas Insurance Code**

122.     The foregoing paragraphs are incorporated herein by reference.

123.     Cincinnati has engaged in unfair or deceptive acts or practices as defined by Section 541.061 of the Texas Insurance Code.

124.     Cincinnati has violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a fair and equitable settlement of Lamacar's Claim when its liability was reasonably clear.

125.     Cincinnati has violated Section 541.060(a)(3) of the Texas Insurance Code by failing to provide any reasonable explanation of the basis in the Policy, in relation to the applicable facts or law, for Cincinnati's failure to acknowledge coverage for the Claim.

126.     In failing to respond to Lamacar's demand for coverage for nearly two months, Cincinnati has violated Section 541.060(a)(4)'s prohibition against failing within a reasonable time to affirm or deny coverage of a Claim.

127.     Cincinnati has violated Section 541.060(7) of the Texas Insurance Code by refusing coverage for the Claim without conducting a reasonable investigation.

128.     As a result of Cincinnati's conduct, Lamacar has suffered damages in an amount no less than $11.6 million as well as attorneys' fees in an amount not less than $15,000.

**C.     Chapter 542 of the Texas Insurance Code**

129.     The foregoing paragraphs are incorporated herein by reference.

130.     Lamacar has made a Claim under the Policy for its loss of business income from dependent properties and has satisfied all conditions under the Policy.

131.    Cincinnati has engaged in conduct that constitutes violations of Chapter 542 of the Texas Insurance Code by delaying and/or failing to timely pay Lamacar's loss in connection with the Claim.

132.    Consequently, Lamacar is entitled to the damages set forth in § 542.060 of the Texas Insurance Code including, in addition to reasonable and necessary attorney's fees, interest at a rate of eighteen percent (18%) per annum, as well as any and all other relief provided therein.

**D.      Breach of the Duty of Good Faith and Fair Dealing**

133.    The foregoing allegations are incorporated herein by reference.

134.    Cincinnati owes Lamacar a duty of good faith and fair dealing in connection with the handling of Lamacar's Claim under the Policy.

135.    Cincinnati has violated its duty of good faith and fair dealing by refusing to indemnify Lamacar for its loss without a reasonable basis. Cincinnati's liability for Lamacar's loss at issue is reasonably clear.

136.    Lamacar has suffered, and will continue to suffer, actual damages as a result Cincinnati's breaches of the duty of good faith and fair dealing.

137.    Cincinnati's acts or omissions in this regard were malicious, fraudulent, and/or grossly negligent, justifying imposition of punitive and exemplary damages.

**E.      Attorneys' Fees**

138.    The foregoing allegations are incorporated herein by reference.

139.    Due to the actions of Cincinnati, Lamacar has been required to retain the services of the law firm of Haynes and Boone, L.L.P. Lamacar has agreed to pay Haynes and Boone a reasonable fee for its services necessarily rendered and to be rendered in this action. Pursuant to Section 38.001 of the Texas Civil Practices & Remedies Code, and Section 542.060 of the Texas

Insurance Code, Lamacar is entitled to an award of its reasonable attorneys' fees against Cincinnati in an amount to be established at trial.

## VIII.   JURY DEMAND

140.   Lamacar hereby requests a jury trial pursuant to TEX. R. CIV. P. 216(a).

## IX.   PRAYER

WHEREFORE, Lamacar respectfully requests that this Court grant it the following relief:

(1)   Judgment awarding Lamacar all damages it has suffered as a result of Cincinnati's breach of the Policy;

(2)   Judgment awarding Lamacar all damages sustained as a result of Cincinnati's violations of Chapter 542 of the Texas Insurance Code;

(3)   Judgment awarding Lamacar all damages sustained as a result of Cincinnati's breach of its duty of good faith and fair dealing.

(4)   Judgment awarding Lamacar all reasonable and necessary attorneys' fees and expenses incurred in this matter under Section 38.001 of the Texas Civil Practice & Remedies Code and/or Chapter 542 of the Texas Insurance Code;

(5)   Judgment awarding Lamacar pre-judgment and post-judgment interest in the amount allowed by law;

(6)   Judgment awarding Lamacar all costs of court; and

(7)   Such other and further relief to which Lamacar may be justly entitled.

Respectfully submitted,


 /s/ Micah E. Skidmore
Micah E. Skidmore
State Bar No. 24046856
micah.skidmore@haynesboone.com
Rae Guyse
State Bar No. 24121652
rae.guyse@haynesboone.com

HAYNES AND BOONE, L.L.P.
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone:      (214) 651-5000
Telecopier:     (214) 651-5940

**ATTORNEYS FOR PLAINTIFF LAMACAR INC. D/B/A KELLI'S GIFT SHOP SUPPLIERS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on the following counsel via ECF, in accordance with the Federal Rules of Civil Procedure on this 14th day of July, 2021:

Martin Sadler
sadler@litchfieldcavo.com
Litchfield Cavo, LLP
One Riverway, Suite 1000
Houston, Texas 77056

*Counsel for The Cincinnati Insurance Company*

 */s/ Micah E. Skidmore*
Micah E. Skidmore